Knight v Family Energy Inc. (2026 NY Slip Op 01599)

Knight v Family Energy Inc.

2026 NY Slip Op 01599

Decided on March 19, 2026

Appellate Division, First Department

HIGGITT, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: March 19, 2026
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Dianne T. Renwick
Sallie Manzanet-Daniels Ellen Gesmer John R. Higgitt Marsha D. Michael

Index No. 650903/23|Appeal No. 5512|Case No. 2024-07538|

[*1]Kevin Knight, et al., Plaintiffs-Respondents,
vFamily Energy Inc., Defendant-Appellant.

Defendant appeals from the order of Supreme Court, New York County (Nicholas W. Moyne, J.), entered November 25, 2024, which denied defendant's motion to compel arbitration of plaintiffs' individual claims, to dismiss the class action claims, and stay the action pending arbitration.

Cyrulnik Fattaruso LLP, New York (Jason Cyrulnik of counsel), Phillips Lytle LLP, New York (Tristan D. Hujer, Thomas F. Puchner, Peter A. Bellacosa, Jeremy M. Amar-Dolan, Nicholas C. Roberts of counsel) and Schoeman Updike & Kaufman LLP, New York (Beth L. Kaufman of counsel), for appellant.
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, White Plains (D. Greg Blankinship and Daniel J. Martin of counsel) and Wittels McInturff Palikovic, New York (J. Burkett McInturff, Ethan Daniel Roman and Jessica L. Hunter of counsel), for respondents.

HIGGITT, J. 

Entities engaged in the production, distribution, or sale of consumer goods and services often prefer to resolve disputes with their customers through arbitration. The law — both federal and state — favors that alternative dispute resolution mechanism. Arbitration, though, is a matter of consent; a party cannot be required to submit to arbitration unless it has agreed to do so. We find that defendant, the party seeking to compel arbitration, failed to demonstrate that plaintiffs consented — that is, agreed — to arbitrate disputes with defendant arising from the parties' energy service contract. Therefore, we affirm Supreme Court's order denying defendant's motion to compel arbitration. 

I.

Defendant, an "energy services company" (General Business Law § 349-d[1][b]), procures energy-using customers, selling them energy that is delivered by the customers' local utilities. In addition to delivering the energy, the local utilities bill defendant's customers for both the utilities' delivery charges and defendant's energy supply charges. Defendant, therefore, neither produces nor delivers energy to customers; rather, defendant serves as a broker and trader of the commodity.
In January 2020, sales representative Luis Deleon, employed by an entity retained by defendant to perform door-to-door marketing services, visited plaintiffs' Syracuse residence, speaking to plaintiff Caroline O'Hara (plaintiff Kevin Knight's spouse). According to O'Hara, Deleon told her that plaintiffs could save money on their energy bills by signing up for defendant's services. O'Hara was interested in those services, so Deleon filled out certain aspects of a pre-printed "Residential Natural Gas & Electricity Supply Agreement." O'Hara printed and signed her name in the appropriate locations. The following is the signature page of the agreement, as executed by O'Hara:
[Remainder of page intentionally left blank.]
The parenthetical statement above O'Hara's signature line reads "(By signing below, I . . . understand and agree to the Terms and Conditions of the Agreement(s))." This incorporation provision is in seven-point font.
O'Hara insists that Deleon provided her with a carbon copy of only the signature page, the reverse side of which contained the heading "Terms & Conditions," followed by four sequentially numbered provisions. Notably, none of the four provisions relates to or makes any reference to dispute resolution generally, or arbitration specifically. The terms-and-conditions page is not paginated, and there is no indication on it that there were additional terms and conditions. O'Hara also insists that the only documentation she received from Deleon was the single double-sided page agreement, a business card, and an annotated energy bill.
Defendant served as plaintiffs' energy service company from February 2020 to August 2020, when plaintiffs canceled the agreement.

II.

In February 2023, plaintiffs commenced this putative class action against defendant, claiming that defendant engaged in deceptive and bad faith pricing practices that resulted in defendant's customers paying inflated energy costs. Plaintiffs alleged that, under the single double-sided page agreement, they agreed to "fixed plans" for a three-year term for their gas and electricity, locking in the rates of 58.9 cents per therm for natural gas and 7.59 cents per kilowatt hour for electricity. According to the complaint, however, from March 2020 to August 2020, plaintiffs were charged significantly more: 73.9 cents per therm for natural gas (a 25.5% increase over the listed figure) and 9.57 cents per kilowatt hour for electricity (a 26.1% increase over the listed figure). Moreover, plaintiffs were charged a "tariff surcharge" on their electrical costs that plaintiffs alleged is not authorized by the agreement. Plaintiffs alleged that other customers of defendant experienced similar overcharges. The complaint contains causes of action for breach of contract (rates charged in excess of those specified in the agreement), violations of General Business Law § 349 (deceptive acts or practices aimed at consumers), violations of General Business Law § 349-d (deceptive acts or practices by an energy services company), and unjust enrichment.
Defendant moved to compel arbitration of plaintiffs' claims. In the underlying affirmation supporting the motion, defendant argued that the parties' true agreement comprised the signature page and four pages of terms and conditions, including a mandatory arbitration provision (paragraph 21); that O'Hara had actual notice of the arbitration provision because she received the carbon copy of the signature page and the complete, four-page set of terms and conditions from Deleon; and, in any event, that the single double-sided page agreement O'Hara claimed to have received placed her on inquiry notice of the arbitration provision. The arbitration provision is broad, requiring the parties to arbitrate "any dispute, claim, or controversy arising out of or relating to th[e] agreement," and specifying that, with limited exceptions, arbitration was the parties' exclusive means of resolving any disputes between them.
In support of its motion, defendant submitted the summons and complaint; O'Hara's affidavit and copies of the documents that she asserted she was given by Deleon (i.e., single double-sided page agreement; business card; annotated energy bill), which affidavit and documents plaintiffs had submitted in connection with a previously aborted motion in the action; and the affidavits of Deleon and an employee of defendant, Tamara Sinson-Banton. In her affidavit, O'Hara provided the above-described account of her interaction with Deleon.
For his part, Deleon averred that, at the time he solicited plaintiffs' business, he used a preprinted form agreement that contained two copies of the signature page (the original and a carbon copy), two double-sided pages of terms and conditions, and two notices of cancellation. Deleon outlined the process he followed when a customer signed the original signature page: (1) Deleon would retain the original signature page; (2) he would provide the customer with a copy of a consumer bill of rights and a single, bound packet consisting of the carbon copy of the signature page, the two double-sided pages of terms and conditions, and the two notice of cancellation forms; and (3) he would return the original signature page to his employer's sales office.
Deleon stated that he reviewed the signature page and two double-sided pages, including all of its terms and conditions, with O'Hara before she signed the signature page, and that the two double-sided pages of terms and conditions were accessible to her. After he reviewed the terms and conditions with O'Hara and filled in certain aspects of the signature page, Deleon presented the agreement to her for her review and signature. O'Hara printed and signed her name in the appropriate locations. Deleon removed and retained the original signature page, and he gave O'Hara the bound agreement packet (i.e., carbon copy of signature page, two double-sided pages of terms and conditions, and two notices of cancellation), as well as a copy of the consumer bill of rights. Deleon stated unequivocally that based on defendant's practices that he employed, O'Hara could not have received only a single double-sided page.
Sinson-Banton, defendant's senior director of customer relations and regulatory affairs, averred to defendant's sales practices; her narrative regarding those practices was consistent with Deleon's explanation. Sinson-Banton also averred to defendant's office practices with respect to paperwork related to new customers. Sinson-Banton stated that, based on the sales and office practices and Deleon's presumed adherence to the former, O'Hara received a copy of the complete terms and conditions.
Sinson-Banton explained defendant's third-party verification telephone call procedures, which entail a third-party entity telephoning a new customer to verify certain information, and affirmed that such a call was made to O'Hara the same day she signed the agreement. According to Sinson-Banton, based on a recording of the call that defendant maintained in the ordinary course of business, O'Hara confirmed that Deleon had given her a copy of the agreement she had signed and a copy of a consumer bill of rights, that she was authorized make changes on the energy accounts for her service address, and that she agreed to the terms of service that were reviewed with her by Deleon. Accompanying Sinson-Banton's affidavit was the signature page and four pages of terms and conditions, including the arbitration provision.
Plaintiffs opposed the motion, arguing that the single double-sided page that Deleon provided to O'Hara did not contain an arbitration provision or any reference thereto. Plaintiffs also argued that the incorporation provision was less than eight-point font and inadmissible under CPLR 4544, and, as a result, that the clause could not serve to bind plaintiffs to terms and conditions outside of those on the single double-sided page. Plaintiffs submitted O'Hara's affidavit and the copies of the documents she asserted were given to her by Deleon, and an affidavit from plaintiff Knight, authenticating a picture of the single double-sided page. These submissions, plaintiffs maintained, conclusively refuted defendant's sales practice evidence suggesting O'Hara received the complete four pages of terms and conditions.
In reply, defendant altered course a bit: in light of Knight's affidavit corroborating O'Hara's averment that the terms and conditions appeared on the reverse side of the carbon copy of the signature page, both Deleon and Sinson-Banton submitted reply affidavits in which they claimed that, pursuant to defendant's sales practices, Deleon would have provided O'Hara with a packet containing the double-sided page (carbon copy of the signature page on one side and the first page of the terms and conditions on the other) with the remaining terms and conditions on the pages that immediately followed. Deleon blamed the inaccuracy in his initial affidavit on the passage of time and its effect on his recollection of the specific layout of the packet; Sinson-Banton chalked up the inaccuracy in her affidavit to inadvertence.

III.

In a thorough decision, Supreme Court denied defendant's motion to compel arbitration, finding that plaintiffs lacked actual or inquiry notice of the arbitration provision. The court, highlighting the contradictory evidence submitted by defendant in support of its motion and in reply, found that defendant failed to establish that O'Hara received the complete set of terms and conditions, or that the terms of the single double-sided page agreement placed O'Hara on inquiry notice of the arbitration provision. The court stated that CPLR 4544 was not preempted by the Federal Arbitration Act (FAA), and that the incorporation clause was unenforceable because it violated the type-size requirement of the statute.

IV.

On appeal, defendant argues that the parties entered into a valid agreement to arbitrate, and that its motion to compel arbitration should therefore have been granted. First, defendant maintains that plaintiffs had actual notice of the arbitration provision because Deleon reviewed all of the terms and conditions (including the arbitration provision) with O'Hara before she signed the agreement. Second, defendant maintains that, even if O'Hara received only the signature page and first page of the terms and conditions (which did not include the arbitration provision), plaintiffs had inquiry notice of the arbitration provision because those pages contained references to additional terms, making O'Hara responsible for assessing and reading the additional terms. Having been made aware of the existence of additional terms, defendant argues, plaintiffs are bound by them even if they did not read them. Additionally, defendant maintains that the incorporation provision placed plaintiffs on notice of the arbitration provision, and that CPLR 4544 is preempted by the FAA and therefore does not prohibit defendant from relying on the text in the agreement that is less than eight-point font.
Defendant also insists that, by virtue of a provision immediately following the arbitration provision, plaintiffs waived the right to commence or participate in a class action against defendant.
Plaintiffs counter that Supreme Court correctly concluded that defendant failed to establish that a valid agreement to arbitrate existed between the parties. As to actual notice, plaintiffs assert that, in the wake of their evidence that O'Hara was provided with only a single double-sided page that did not include an arbitration provision, defendant failed to establish that plaintiffs received or otherwise were presented with the purported four-page document that included the arbitration provision. As to inquiry notice, plaintiffs stress that neither the signature page nor the terms-and-conditions page on its reverse side refers to arbitration, and the stray references to a handful of numbered provisions not present on the terms-and-conditions page did not call plaintiffs' attention specifically to the arbitration provision. Thus, the arbitration provision was not clearly and conspicuously presented to O'Hara, and it was not made available for her review.[FN1]
Plaintiffs object to defendant's effort to incorporate into the single double-sided page agreement received by O'Hara the purported remaining three pages of terms and conditions (including the arbitration provision) because the text on the signature page used to effectuate the incorporation is seven-point type and violates CPLR 4544. Plaintiffs note defendant acknowledges that the incorporation text is in seven-point type. By plaintiffs' lights, an enforceable agreement between the parties exists, but that agreement is limited strictly to the content of the single double-sided page agreement (which does not include an arbitration provision).

V.

1.
Initially, we find that, whether by virtue of the interstate-commerce nature of the services provided by defendant to plaintiffs or the language of paragraph 21, the agreement's arbitration provision, this dispute is governed by the FAA.
2.
The FAA reflects a liberal federal policy favoring arbitration agreements, generally requiring a court to direct arbitration of a dispute where the parties have entered into an agreement to arbitrate (see A&T Mobility LLC v Concepcion, 563 US 333, 339 [2011]; Starke v SquareTrade, Inc., 913 F3d 279, 288 [2d Cir 2019]). An arbitration agreement, which the FAA demands be treated the same as any other type of contract, is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract" (Henry Schein, Inc. v Archer and White Sales, Inc., 586 US 63, 67 [2019], quoting 9 USC § 2; A&T Mobility LLC, 563 US at 339; Wu v Uber Tech., Inc., 43 NY3d 288, 297 [2024]). A dispute as to whether the parties must arbitrate a matter is therefore a contractual dispute, with the initial question being "[w]hat have these parties agreed to?" (Wu, 43 NY3d at 298 [internal quotation marks omitted]; see Sudakow v CleanChoice Energy, Inc., 153 F4th 280, 285 [2d Cir 2025]; Starke, 913 F3d at 288). The question of whether the parties agreed to arbitrate is governed by state contract law, "provided that those rules do not expressly or covertly discriminate against agreements to arbitrate" (Wu, 43 NY3d at 298; see Sudakow, 153 F4th at 285; Meyer v Uber Tech., Inc., 868 F3d 66, 73-74 [2d Cir 2017]).
The party seeking to compel arbitration has the initial burden of demonstrating that an agreement to arbitrate was made (Zachman v Hudson Valley Credit Union, 49 F4th 95, 101-102 [2d Cir 2022]; see Wu, 43 NY3d at 299); that burden does not require the party seeking to compel arbitration to show that the agreement to arbitrate is enforceable (Zachman, 49 F4th at 102; see also Wu, 43 NY3d at 308-309). The issue of whether an agreement to arbitrate was made is for the court, not an arbitrator (see Henry Schein, Inc., 586 US at 69; 15 Timothy Murray, Corbin on Contracts § 83.5 at 210 [rev ed 2020 update]).[FN2]
Under New York law, "a binding contract requires an objective manifestation of mutual assent, through either words or conduct, to the essential terms comprising the agreement" (Wu, 43 NY3d at 299 [internal quotation marks omitted]; see Starke, 913 F3d at 288-289). An objective manifestation of mutual assent occurs when an offer proffered by an offeror is accepted by an offeree (see Wu, 43 NY3d at 299; Starke, 913 F3d at 289). An offeree must have notice — actual or inquiry — of the material terms in order to assent to them (see Wu, 43 NY3d at 299; Sudakow, 153 F4th at 285; Zachman, 49 F4th at 102; Starke, 913 F3d at 289). Thus, a binding agreement to arbitrate requires an objective manifestation of assent to arbitrate.
In common parlance, actual notice entails the offeree's direct, explicit knowledge of the material terms. With inquiry notice, "[a]n offeree is placed on . . . notice of contractual terms when those terms are clearly and conspicuously presented to the offeree as a contract and made available for review" (Wu, 43 NY3d at 299; see Sudakow, 153 F4th at 285 ["In determining whether an offeree is on inquiry notice of contract terms, New York courts look to whether the term was obvious and whether it was called to the offeree's attention" (internal quotation marks omitted)]; Zachman v Hudson Valley Credit Union, 49 F4th at 102, quoting Starke, 913 F3d at 289 [whether a term was obvious and whether it was called to the offeree's attention "often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way"]). The existence of inquiry notice must be evaluated objectively: whether the reasonably prudent offeree would have been on inquiry notice of the material terms (see Wu, 43 NY3d at 299-300; Sudakow, 153 F4th at 287). If, and only if, the contractual terms are clearly and conspicuously presented to the offeree and made available for review, then the offeree is charged with the responsibility, before manifesting assent, to inquire by accessing and reading the proposed terms (see Wu, 43 NY3d at 299-300).
3.
Defendant failed to satisfy its initial burden of showing that plaintiffs had actual notice of the arbitration provision.
In its underlying submission supporting its motion to compel, defendant submitted the affidavits of Deleon and Sinson-Banton, both of whom stated with certainty that Deleon followed a particular, established business practice when soliciting O'Hara's business, and that, as a result of his adherence to that practice, Deleon would have reviewed the terms and conditions with O'Hara before she signed the agreement, that the terms and conditions were available to her, and that he would have left a single, bound packet consisting of the carbon copy of the signature page and two double-sided pages of terms and conditions (which necessarily would have included the arbitration provision).
After defendant's narrative of the transaction was challenged by plaintiffs in opposition to the motion, defendant offered a different version of the relevant business practice, relying on new affidavits from Deleon and Sinson-Banton.
As a procedural matter, defendant could not employ its reply to remedy a basic deficiency in its prima facie showing (see Kennelly v Mobius Realty Holdings LLC, 33 AD3d 380 [1st Dept 2006]).[FN3] After all, defendant's theory of actual notice rested on its sales representative's adherence to a business practice and defendant was unable to establish, in its underlying submission, the actual relevant practice (if any) that Deleon used.
As a substantive matter, the inconsistent factual presentation between defendant's underlying submission and its reply submission leaves a void on the critical question of what documents were reviewed with O'Hara, undermining defendant's contention that a particular business practice was employed and followed such that O'Hara received actual notice of the arbitration provision. Notably, too, Deleon, in his reply affidavit, acknowledged the amount of time that had passed between his interaction with O'Hara and the date he prepared his initial affidavit (approximately three and a half years), suggested that the passage of time may have affected his recollection, and did not repeat his prior averment that he reviewed the terms and conditions (whatever they were) with O'Hara before she signed the agreement.
Ultimately, therefore, defendant failed to make an initial showing through evidence in admissible form that O'Hara had actual — that is, direct and explicit — knowledge of the arbitration provision.
4.
Similarly, defendant failed to satisfy its initial burden of showing that plaintiffs had inquiry notice of the arbitration provision.
Defendant rests its primary inquiry notice theory on O'Hara's receipt of the signature page and first page of the terms and conditions: plaintiffs had inquiry notice of the arbitration provision because those pages contained references to additional terms, making O'Hara responsible for accessing and reading the additional terms. But those additional terms had nothing to do with dispute resolution, generally, or arbitration, specifically. Rather, the additional terms referenced on the signature page related to provision numbers 6 (a green energy program), 8 (a cancellation provision), 11 (a cash-back feature), and 20 (an LED-light bulb program). Nowhere on the signature page or first page of the terms and conditions was the reader's attention called to an alternative dispute resolution mechanism. Clear and conspicuous presentation of material terms unrelated to arbitration cannot equate to inquiry notice of an arbitration provision, a separate material contractual term. Resultantly, the arbitration provision was not clearly and conspicuously presented to the offeree, and a reasonably prudent offeree would not have been on inquiry notice of the arbitration provision. Fundamentally, plaintiffs were aware they had contracted for energy supply services, but had no reason to think that they agreed to arbitration.
Defendant's additional inquiry notice theory fares no better. As reviewed above, defendant failed to establish with evidence in admissible form that Deleon reviewed or otherwise provided O'Hara with terms and conditions beyond those reflected on the reverse side of the signature page. The incorporation provision, which provided "(By signing below, I . . . understand and agree to the Terms and Conditions of the Agreement(s))," therefore, applied only to the terms and conditions on the reverse side of the signature page.[FN4]
5.
Defendant's contention that plaintiffs waived the right to commence or participate in a class action based on a class action waiver provision in the agreement that immediately followed the arbitration provision fails for the same reasons.

VI.

Because defendant, the party seeking to compel arbitration, failed to discharge its initial burden of demonstrating that an agreement to arbitrate was made, Supreme Court correctly denied defendant's motion.
Accordingly, the order of Supreme Court, New York County (Nicholas W. Moyne, J.), entered November 25, 2024, which denied defendant's motion to compel arbitration of plaintiffs' individual claims, to dismiss the class action claims, and stay the action pending arbitration, should be affirmed, with costs.
Order, Supreme Court, New York County (Nicholas W. Moyne, J.), entered November 25, 2024, affirmed, with costs.
Opinion by Higgitt, J., All concur.
Renwick, P.J., Manzanet-Daniels, Gesmer, Higgitt, Michael, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: March 19, 2026

Footnotes

Footnote 1: Additionally, plaintiffs claim that the class action waiver (which, among other things, prohibits a party from seeking statewide injunctive relief) violates New York law (General Business Law § 349-d), is unenforceable, and triggers "poison pill" language in the agreement that renders the arbitration provision inapplicable.

Footnote 2: While a court must determine in the first instance whether a valid arbitration agreement was made, the parties may delegate questions relating to the "arbitrability" of a dispute (e.g., whether the particular dispute falls within the ambit of the arbitration agreement, or whether one party should be relieved from the agreement due to the wrongful conduct of another party), to the arbitrator (see Henry Schein, Inc., 586 US at 69; see also Wu, 43 NY3d at 301-302, 308-309). On this appeal, we are concerned with the threshold, contract-formation issue of whether a valid arbitration agreement was made, not an issue relating to arbitrability (cf. Wu, 43 NY3d at 308-309). In any event, neither party suggests that the issue before us must be determined by an arbitrator.

Footnote 3: In adjudicating a motion to compel arbitration, a court applies the standards similar to those applicable to a summary judgment motion (see Zachman, 49 F4th at 101).

Footnote 4: In light of our conclusion that the incorporation provision does not operate to bind plaintiffs to terms beyond those listed on the reverse side of the signature page, we need not pass on the issue of whether CPLR 4544 is preempted by the FAA.